IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| VALMONT INDUSTRIES, INC.,<br><br>                    Plaintiff,<br><br>        vs.<br><br>JOAO REBEQUI, an individual;<br><br>                    Defendant. | **8:25CV161**<br><br>**MEMORANDUM AND ORDER** |

Before the Court is Valmont Industries, Inc.'s Motion for a Preliminary Injunction. Filing No. 18.   Joao Rebequi is a former Valmont executive whose employment was terminated during a reduction in force.  Rebequi's severance agreement included non-compete and non-solicitation clauses.  After leaving Valmont, Rebequi continued to work in the irrigation industry—including consulting and financing work.  Valmont believes Rebequi's post-employment business activities violate his severance agreement and moves to enjoin him from participating in these endeavors during the pendency of this litigation.  The Court concludes—based on the current record—Valmont is likely to succeed on a narrow portion of its breach of contract claim.  Valmont has shown irreparable harm associated with that claim and is entitled to a correspondingly narrow injunction.

## BACKGROUND

This is a noncompete case.  Valmont is a Nebraska industrial corporation servicing the agriculture and infrastructure sectors.  Filing No. 20-2 at 2.  Rebequi was an executive with Valmont for many years, ending as Vice President of Business Development and Strategy.  Id. at 3.  After his career with Valmont ended, he continued to work in the South

American irrigation market.  This lawsuit arises out of these post-employment business ventures.

### A. Valmont's Business Operations

Relevant here, Valmont manufactures and distributes irrigation equipment and associated technology.  Filing No. 20-2 at 2.  Valmont markets its irrigation products around the world.  This case primarily involves the South American market—specifically Brazil.

One of Valmont's key products is pivot irrigation systems.  *Id.*  Pivot irrigation uses movable equipment to ensure even coverage across a farmer's field.  Valmont's pivot irrigation equipment collects data, including water usage data, that the farm can use to improve the efficiency and productivity of its operation.  *Id.* at 3.

Valmont does not sell its pivot equipment directly to farmers.  Instead, it distributes its products through regional dealers.  Filing No. 20-2 at 1–2.  The dealers purchase a store of Valmont irrigation products and parts.  *Id.*  The farmer works with the dealer to purchase or lease equipment and obtain any needed repairs.  *Id.*  Thus, the relationship between Valmont and its dealers is one of the most important business relationships in the Brazilian market.  *Id.* at 1.

As an executive, one of Rebequi's key initiatives was a program called Valley Leasing and was marketed as "Water on Demand," a subscription irrigation service.  *Id.* at 4–5.  The goal of the Water on Demand program was to provide Valmont products and services to smaller agribusinesses who cannot afford to purchase equipment outright.  Effectively, in a Water on Demand arrangement, Valmont acted as the financer for a lease

agreement between the farmer and the Valmont dealer and advised the agribusiness how to improve its operations.

Water on Demand was a successful program but hit a ceiling late in Rebequi's tenure. Filing No. 31-5. Specifically, because Valmont acted as a financier, it assumed the risk if an agribusiness was unable to pay its subscription fee. So, between 2022 and 2024, Valmont stopped soliciting new Water on Demand contracts, maintained its existing contracts, and sought a funding partner. Filing No. 29-2 at 1–2. Now, lease financing is handled by Valmont's preferred financing partner—a Brazilian financial services company called Unidas. *Id.*

To summarize: in a Water on Demand deal, the agribusiness contracts with Valmont who provides, via Valmont's local dealers, irrigation supplies (a central pivot, pipeline, motor pump) along with a subscription to maintenance, insurance, and management services. This lease agreement is financed by Unidas.

## B. Rebequi's Employment with Valmont and Severance Agreement

Rebequi is a former Valmont executive who cut his teeth in the Brazilian market before moving up the corporate ladder to Valmont's internation headquarters in Omaha. Filing No. 20-2 at 3. His final position with the company was Vice President of Business Development and Strategy. *Id.* In that role, he spearheaded Valmont's efforts internationally, including in Brazil. Filing No. 29-2 at 1. As a result, he was involved in negotiations with dealers and designed the Water on Demand program. *Id.*

In 2023, Valmont restructured its operations and eliminated Rebequi's role. He received a $209,430 severance payment. Filing No. 25-5. In exchange, he signed a Severance Agreement. *See generally id.* (the Severance Agreement). Concerned that

Rebequi, a high level executive with extensive knowledge of Valmont's business and relationships with Valmont's key contacts, would use his talents against them, Valmont included restrictive covenants in the Severance Agreement. Those provisions read in full:

> In order to protect the Company[1] against disclosure of Confidential Information referred to in Paragraph 3(a) of this Agreement, and against the unfair loss of consumers and clients, goodwill and employees of the company, for a period of two (2) years following your Separation Date, you agree you will not, directly or indirectly, on your own behalf or on behalf of a third party:
>
> Recruit, solicit, employ, or engage the services of (as employee, consultant or agent) any officer, director, or employee of the Company or solicit such person to terminate his or her employment and/or engagement with the Company to become employed by or engaged in any other business activity with whom you have become affiliated: and
>
> Offer or provide, or solicit to offer or provide, products or services that are the same or substantially similar to or competitive with those provided by the Company, to any of the Company's customers and clients with whom you actually did business and had personal contact while employed by the Company.

Filing No. 25-5. Rebequi's non-compete expires in September.

### C. Rebequi's Post-Employment Business Ventures

After leaving Valmont, Rebequi continued to work in the irrigation business. Two of his post-Valmont ventures are relevant here.

The first, Ag4UP, is a consulting firm that advises agribusiness corporations on "mergers and acquisitions and other business functions." Filing No. 25-1 at 3. Rebequi fully owns, and is the principal of, Ag4UP. At oral argument, he disclosed one of his primary consulting clients is Bauer—one of Valmont's main competitors internationally.

The second, IARA, is a financial services company that helps individual farmers finance the purchase or lease of irrigation equipment. Filing No. 25-1 at 3. Rebequi owns

---

[1] Company is defined in the contract as "Valmont Industries Inc., together with its subsidies and affiliates."

a 25% stake in IARA and serves on the board but does not participate in the day-to-day operations of the company. *Id.* The day-to-day operations are handled by Hiran Moreira, another former Valmont employee. *Id.* IARA has worked with both Valmont and its competitors in Brazil. For example, it helped Valmont buy out a distressed agribusiness's equipment lease, allowing the customer to stay with Valmont. Filing No. 31-1. More recently, IARA and Ag4UP partnered with Bauer to offer a subscription irrigation service in Brazil.[2] Filing No. 29-2 at 9 (a LinkedIn post announcing the partnership).

Valmont is concerned that some of Rebequi's activities violated his non-compete and non-solicitation agreements. Specifically, they contend:

- The IARA, Ag4UP, and Baur subscription irrigation product competes with Valmont's Water on Demand service. *See* Filing No. 29-2 at 1–5. In support, they produce a LinkedIn post listing agribusinesses that receive irrigation financing through IARA. *Id.* at 9. They contend that some of these agribusinesses were former Valmont clients who Rebequi personally worked with. *See* Filing No. 20-4 at 4–5; Filing No. 20-4 at 7 (a LinkedIn post collecting new IARA clients). The record regarding Rebequi's participation in these transactions is sparse beyond his role as a part-owner of IARA.

- Rebequi—through his consulting company Ag4UP—worked to "flip" two dealers from selling Valmont products to Bauer products. One, Maqcampo, a dealer that switched from Valmont to Bauer in 2024. Filing No. 20-3 at 2–4. Maqcampo was formed out a merger of several dealers Rebequi worked with directly during his time with Valmont. *Id.* at 2. Rebequi admits he was involved in negotiations

---

[2] IARA provides lease financing—like the role played by Unidas in the Water on Demand program. Ag4UP's role in the partnership is unclear.

between Maqcampo but produced evidence that they switched for other reasons. Filing No. 25-1 at 5.  Two, Central, a dealer who Rebequi worked with while at Valmont.  Filing No. 29-2 at 4–6.  Rebequi admits he approached Central on behalf of Baur as a possible acquisition target.  Filing No. 25-1 at 5.

- Rebequi—through Ag4UP—attempted convince Pivodrip, a Valmont dealer, to carry products on behalf of UMC, a Chinese company.  Filing No. 29-2 at 5–6. Rebequi admits he was approached by UMC to negotiate a deal with Pivodrip. Filing No. 25-1 at 5–6.  But, concerned about his non-compete, Rebequi disclosed this potential engagement to Valmont and, ultimately, did not go forward.  *Id.*

- Rebequi attempted to recruit Valmont employees, including Moreira in 2024 (Filing No. 20-2 at 6–7), Dario de Pronca (Valmont's Director of Dealer Development) in 2024 and 2025 (Filing No. 20-3 at 3), Renato Silva ("a key employee") in 2024 (Filing No. 20-3 at 3), Vincius Melo (Valmont's Director of Sales, Brazil) in 2023 and 2024, to leave Valmont and join his ventures (Filing No. 20-4).

- Moreira, one of the other owners of IARA, forwarded emails containing Valmont's confidential information regarding the Water on Demand program to his personal emails.  Filing No. 29-2 at 3–4.  In support, Valmont attached a screenshot of an email folder containing emails with subject lines referencing Water on Demand.  *Id. at 7*.

Valmont approached Rebequi with its concerns and the Parties were not able to resolve their differences.

6

### D.  This Litigation

Valmont filed this lawsuit alleging these business activities violated Rebequi's severance agreement and were otherwise illegal.  Filing No. 1.  Specifically, Valmont brought state law claims for breach of contract, tortious interference, misappropriation of trade secrets under Neb. Rev. Stat. §§ 87-501 to 87-507, breach of fiduciary duty, and unjust enrichment and a federal law claim under the Defend Trade Secrets Act (18 U.S.C. §§ 1836–1839).  Rebequi answered and asserted a state law counterclaim for defamation.  Valmont then moved for a preliminary injunction and the Court held a hearing.

The Court has jurisdiction over Valmont's federal claims under 28 U.S.C. § 1331. The Court has jurisdiction over Valmont's state law claims under 28 U.S.C. § 1367 because they arise "from a common nucleus of operative fact"—Rebequi's post-employment business activities.  Benchmark Ins. Co. v. SUNZ Ins. Co., 36 F.4th 766, 771 (8th Cir. 2022).

### LEGAL STANDARD

Fed. R. Civ. P. 65 governs the issuance of preliminary injunctive relief.  In deciding whether to issue a preliminary injunction, the Court considers: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."  Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc),

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  Consequently, a court must

be "mindful that a movant carries a 'heavier' burden when granting a preliminary injunction has the effect of awarding the movant substantially the relief it could obtain after a trial on the merits." *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 946 (8th Cir. 2023) (quoting *Calvin Klein Cosms. Corp. v. Lenox Lab'ys, Inc.*, 815 F.2d 500, 503 (8th Cir. 1987)).

Nebraska substantive law governs Valmont's state law claims. *See Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); [contract] ("choice of law provision"). In analyzing Valmont's state law claims the Court is "bound in [its] interpretations of Nebraska law by the decisions of the Nebraska Supreme Court." *Packard v. Darveau*, 759 F.3d 897, 901 (8th Cir. 2014) (quoting *Lindsay Mfg. Co. v. Hartford Acc. & Indem. Co.*, 118 F.3d 1263, 1267 (8th Cir. 1997). If the Nebraska Supreme Court has not considered an issue, the Court must "predict what the court would decide if it were to address the issue" based on "relevant state precedent, analogous decisions, considered dicta, . . . and any other reliable data." *Id.* (internal quotations omitted).

## DISCUSSION

Valmont is entitled to a narrow injunction based on a narrow portion of its breach of contract claim related to the solicitation of dealers. Valmont's trade secret and breach of fiduciary duty claims, at this stage of the proceedings, do not support an injunction because Valmont has not shown that it is likely to succeed on the merits. Valmont, while likely to succeed on the merits of its contract claim related to employee solicitation, has not shown that it will suffer irreparable harm and is not entitled to a preliminary injunction.

### A. Likelihood of Success on the Merits

The Court starts with the "most important" factor—Valmont's likelihood of success on the merits. *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011). In this posture, Valmont "must show that it has at least a 'fair chance of prevailing.'" *Miller v. Honkamp Krueger Fin. Servs., Inc.*, 9 F.4th 1011, 1014 (8th Cir. 2021) (quoting *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013).

### 1. Trade Secrets

Valmont has not shown a likelihood of success on its federal and state trade secret claims. Valmont theory is that Rebequi uses trade secret information in connection with his current business activities. But Valmont does not cite any authority establishing the elements of its trade secrets claims or explain how the evidence demonstrates that they are likely to succeed in meeting those elements. And—while using the terms trade secrets and confidential information—Valmont does not explain with specificity what information was used and why it falls within the statutory definition of trade secret. *See Sapir v. Rosen*, No. 20-CV-6191 (RA), 2021 WL 4482277, at *5–6 (S.D.N.Y. Sept. 30, 2021) (dismissing a trade secret claim that failed to identify the trade secret with specificity from a long list of allegedly confidential documents). This legal deficiency alone is fatal to a showing of likelihood of success on the merits. *See e.g.*, *Digit. Monitoring Prods., Inc. v. Hall*, No. 23-03328, 2023 U.S. Dist. LEXIS 239355 at *7 (W.D. Mo. Dec. 11, 2023) (denying a preliminary injunction when plaintiff failed to brief the elements of a trade secret claim).

Nor does the evidentiary record allow the Court to connect the dots. None of Valmont's witnesses identify—with specificity—the nature of the trade secrets or possess

9

personal knowledge of their use.  *See Guy Carpenter & Co. v. John B. Collins & Assocs., Inc.*, No. 05-1623JRTFLN, 2006 WL 2502232, at *2 (D. Minn. Aug. 29, 2006) (concluding a party's "failure to identify trade secrets with specificity renders the Court powerless to enforce a trade secret claim.").   Instead, Valmont's witness opines that Rebequi, an experienced executive in the agribusiness industry, got his business up and running too fast and must have relied on Valmont trade secrets.  *See* Filing No. 29-2 at 4 ("[I]t is implausible to suggest that Ag4UP an IARA's subscription irrigation business could have established its business within one month of Mr. Rebequi's departure without the reliance on and utilization of the confidential information and trade secrets . . ..").  This speculation is insufficient to meet Valmont's burden.   Valmont's best evidence relates to Rebequi's business partner Moreira.  An email screenshot suggests that Moreira sent emails with subject lines related to Water on Demand from his Valmont email to his personal email before leaving the company.   But the contents of those emails are not before the Court and the Court cannot judge whether they actually contain trade secrets.   In short, Valmont's "failure to identify trade secrets with specificity renders the Court powerless to enforce a trade secret claim."  *Guy Carpenter & Co.*, 2006 WL 2502232 at *2.

The Court recognizes this litigation is in its early stages.  Valmont may develop better evidence and argument on the trade secret claims in discovery and beyond.  But, on this record, the Court cannot say that Valmont has a fair chance of success on the merits of its trade secrets claims.  Without such a showing, Valmont faces an uphill battle in obtaining a preliminary injunction related to trade secrets.

### 2. Breach of Fiduciary Duty

Valmont's breach of fiduciary duty claim is equally underdeveloped. Valmont does not explain the nature of Rebequi's fiduciary duty to the company or cite any authority discussing a former executive's fiduciary duty to his former employer. On this record, the Court cannot say Valmont has a fair chance of success on their breach of fiduciary duty claim.

### 3. Breach of Contract

Valmont has shown a likelihood of success on the merits on a sliver of its breach of contract claim related to the solicitation of dealers. Otherwise, the record does not show a likelihood of success on the merits. Under Nebraska law, a claim for breach of contract requires showing: (1) a valid promise, (2) a breach of that promise, (3) damages, and (4) compliance with any conditions' precedent. *See Ryan v. Streck, Inc.*, 958 N.W.2d 703, 710 (Neb. 2021) (describing the elements of a contract claim). Here, nobody disputes that the severance agreement is a contract or that it is subject to any outstanding condition precedent. Instead, the parties' disputes turn on: (1) whether the restrictive covenants are enforceable, and (2) whether Rebequi breached the agreement.

#### a. Validity of the restrictive covenants.

Valmont is likely to show that the restrictive covenants in Rebequi's severance agreement are enforceable. Under Nebraska law, restrictive covenants are enforceable if they are reasonable. For example, the Nebraska Supreme Court has upheld limitations on soliciting customers who the employee had personal relationships with during their time with the employer. *Pro. Bus. Servs., Co. v. Rosno*, 589 N.W.2d 826 (Neb. 1999). Likewise, the Nebraska Supreme Court upheld a two-year limitation on soliciting a former

employee's clients. *Aon Consulting, Inc. v. Midlands Fin. Benefits, Inc.*, 748 N.W.2d 626, 638–39 (Neb. 2008). Same here. Rebequi's non-compete lasts for two years and is limited to Valmont's "customers and clients with whom [Rebequi] actually did business and had personal contact while employed by" Valmont. Filing No. 25-5 at 4. So, it has the same limitations on duration and scope as restrictive covenants upheld by the Nebraska Supreme Court as reasonable.

### b. Breach: Use of confidential information

Valmont has not shown they are likely to succeed on their claim that Rebequi violated the Severance Agreements confidential information provision for many of the same reasons that doomed their trade secrets claim. "Likelihood of success cannot be woven from the gossamer threads of speculation and surmise." *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991). Valmont's witnesses speak of confidential information in general terms which make it difficult to assess whether Rebequi complied with his contractual obligations. Nor does the record show a "smoking gun" of Rebequi personally transferring confidential information. Additionally, Valmont's declarations were executed by Valmont employees who lack first or secondhand knowledge of Rebequi's use of confidential information. As a result, their testimony amounts to speculation, or their best guess, about Rebequi's activities. The Court acknowledges Valmont is hobbled by the underdeveloped factual record and is amenable to revisiting the issue with the benefit of discovery. But, on the current record, Valmont has not shown a fair probability of success on their claim that Rebequi breached the confidential information provision.

### c. Breach: Solicitation of dealers

Valmont has shown a fair chance of succeeding on their claim that Rebequi's contact with dealers breached his Severance Agreement.

As a threshold matter, Valmont is likely to succeed on its argument that the Severance Agreement's reference to "customers and clients" includes dealers. "A contract written in clear and unambiguous language is not subject to interpretation and must be enforced according to its terms." *Kluver v. Deaver*, 714 N.W.2d 1, 7 (Neb. 2006). Here, the noncompete applies to "customers and clients." Filing No. 25-5 at 4. A customer is "one who purchases a commodity or service." Customer, MirriamWebster, https://www.merriam-webster.com/dictionary/customer. Here, the dealers purchase equipment and parts from Valmont to sell to farmers fitting comfortably within the everyday meaning of customer. Indeed, the record suggests that dealers are among the most important purchasers of Valmont products. At this stage it appears the noncompete clause "clear[ly] and unambiguous[ly]" applies to dealers and the Court will be required to "enforce[]" it "according to its terms." *Kluver*, 714 N.W.2d at 7.

Resisting the plain language of the agreement, Rebequi raises two arguments. First, he argues that he did not understand "customers" to include "dealers" at the time he signed the severance agreement. But contract interpretation does not turn on what was in Rebequi's mind and heart when he signed the agreement. *DH-1, LLC v. City of Falls City*, 938 N.W.2d 319, 326 (Neb. 2020). Rather it is based on how a reasonable person would understand the language he agreed to. *Id.* So Rebequi's subjective understanding is irrelevant to what the contract means. Second, Rebequi argues, in the irrigation industry, a customer is considered different than a dealer. True, evidence of

trade usage that differs from the ordinary meaning may create ambiguity in a term's meaning. *See* Restatement (Second) of Contracts § 201 cmt. a. But, here, Rebequi's only evidence of this specialized industry meaning is his own conclusory testimony, a webpage for Valmont dealers, and existence of a separate division of Valmont related to dealer relations. Filing No. 25-1 at 2; Filing No. 25-10. This other evidence is consistent with the plain meaning of the contract. The webpage perhaps shows that dealers are a separate customer base than farmers but does not change the relationship between Valmont and the dealers. Filing No. 25-10. It makes sense that Valmont would have "a specific global division for dealer development" if dealers were an important subset of customers. Filing No. 25-1 at 2. Thus, on this record, Rebequi's arguments do not change the Court's conclusion that Valmont has a fair chance of showing the non-compete applies to dealers.

With that clarification in mind, the record shows that Valmont has a fair chance of showing Rebequi solicited dealers he worked with personally while a Valmont executive. Valmont presents a detailed account from an employee of Central—a dealer Rebequi worked with while at Valmont—indicating Rebequi approached Central and proposed they stop selling Valmont products and start selling Bauer products. Filing No. 29-2 at 4–6. Thus Rebequi "solicit[ed] to offer or provide products"—Bauer irrigation equipment—"that are the same or substantially similar to or competitive with" Valmont's irrigation equipment, to Central—a Valmont "customer[] . . . with whom" Rebequi "actually did business and had personal contact while employed by" Valmont. For his part, Rebequi does not contest that approached Central on behalf of Bauer but disagrees with Valmont's framing of the transaction. And, Rebequi has taken the consistent position that his non-

compete does not apply dealers supporting the inference he may have solicited dealers. Accordingly, Valmont has shown a fair possibility of success of showing breach based on Rebequi's contacts with Central.

Further supporting Valmont's likelihood of success on the merits is Rebequi's contacts with Maqcampo. The Court does not prejudge the legal question of whether Maqcampo—a successor in interest to clients Rebequi had personal contacts with—is a "customer or client" under the Severance Agreement. But, at the very least, this incident demonstrates that Rebequi was willing to initiate contact businesses connections he worked with personally while at Valmont on behalf of Bauer—bolstering Valmont's version of events regarding Central.

To summarize: Valmont has a fair chance of showing the noncompete clause applies to dealers and that Rebequi solicited dealers on behalf of a competitor.

### d. Breach: Solicitation of Agribusinesses.

The solicitation of agribusiness clients is another story. While Rebequi's partnership with IARA and Bauer may raise the specter of competition, Valmont's evidence that he personally solicited farmers is entirely speculative.

Valmont has a fair chance of showing the subscription irrigation partnership with Bauer may be "competitive with" goods and services "provided by" Valmont. Specifically, the subscription water service, in which IARA provides financing and Baur provides equipment looks a lot like Valmont's Water on Demand arrangement with Unidas. And, while Valmont no longer is the entity financing these transactions, IARA's financing supports a "product" that is "competitive with" goods and services "provided by" Valmont.

But Valmont has offered only speculation that Rebequi has personally offered these services or solicited agribusiness clients on behalf of this partnership.  Rebequi's role with IARA is murky.  At best, the evidence shows Rebequi is an investor and board member in IARA.  But the noncompete clause does not bar Rebequi from investing in a competitor or serving on its board.  *Cf., Prof. Bus. Servs. Co.*, 589 N.W.2d at 832 (reproducing a non-compete that read "he shall not directly or indirectly solicit, contact or perform services for any of Employer's clients for his own benefit or as an officer, director, shareholder, partner, advisor, consultant or employee of any third party.").  Instead, it bars him from "[o]ffer[ing] or provid[ing] . . . products or services . . . that are . . . competitive with those provided by" Valmont "to any of" Valmont's "customers and client with whom you actually did business and had personal contact with while employed by the company." There is no evidence that Rebequi personally solicited the agribusinesses to finance Bauer products through IARA.  Indeed, the best evidence is a LinkedIn post showing clients who formerly financed through Valmont and now finance through IARA.  But, beyond the speculation of Valmont's employees, the record is silent on Rebequi's participation in those transactions.  And, unlike the dealers, Valmont has not produced any account from these agribusinesses that Rebequi was personally involved in their switch from Valmont to IARA.  Thus, the current record does not contain enough information to conclude Valmont has a fair chance of success on this claim.

Valmont urges the Court to adopt a broader reading of the noncompete provision. It argues because Rebequi serves on IARA's board and partners with IARA and Bauer, their solicitation of customers is imputed to Rebequi.  So, their argument goes, he "indirectly" solicited or provided competing services to the former Valmont clients.  At this

16

preliminary stage, the Court is concerned that reading the noncompete this broadly would raise validity concerns. Specifically, under Nebraska law, a noncompete must be "no greater than reasonably necessary to protect [Valmont's] legitimate interest." *Prof. Bus. Servs. Co.*, 589 N.W.2d at 831. The customer limitation is reasonable because it addresses "an employee's opportunity to appropriate the employer's goodwill by initiating personal contacts with the employer's customers. Where an employee has substantial personal contact with the employer's customers, develops goodwill with such customers, and siphons away the goodwill under circumstances where the goodwill properly belongs to the employer, the employee's resultant competition is unfair, and the employer has a legitimate need for protection against the employee's competition." *Id.* (*quoting Moore v. Eggers Consulting Co.*, 562 N.W.2d 534, 539 (Neb. 1997)). Here, solicitation by Bauer of IARA—without Rebequi's participation—does not involve these same concerns.[3] Specifically, it is hard to say those entities relied on the Valmont-created halo around Rebequi, if Rebequi was just a silent partner providing money in the background. Taken to its extreme, such a rule would turn a narrow provision protecting Valmont's goodwill to a de-facto limitation on Rebequi's investments and career choices—even when the unique risks to Valmont's reputation goodwill are not implicated. Valmont is "not entitled to protection against ordinary competition from a former employee" and finding a breach without Rebequi's personal involvement risks creating a noncompete "more restrictive

---

[3] These activities may raise issues under Moreira's noncompete. But Moreira is not a party to these proceedings and, as Valmont admitted at oral argument, his Brazilian residence may pose a barrier to obtaining effective relief in American court.

than necessary to protect [Valmont's] legitimate interests." *Id.* So, at this preliminary juncture, the Court declines to adopt Valmont's broad definition of indirect competition.[4]

While the current record is insufficient to show a fair prospect of success on this theory, Rebequi's subscription irrigation raises possible competition concerns and— consistent with the guidance in this order—he should tread carefully around current Valmont customers in this venture.

### e. Breach: Solicitation of employees

Valmont has a fair chance of success on its claim that Rebequi breached the Severance Agreement by soliciting Valmont employees. de Pronca and Melo executed detailed declarations explaining Rebequi's efforts to recruit them to Ag4UP and IARA. Filing No. 20-2; Filing No. 20-3. While Rebequi disputes the veracity of their claims, they at least show a fair chance that Valmont will succeed in showing Rebequi "solicit[ed]" a Valmont employee "to terminate his or her employment and/or engagement with the Company to become employed by or engaged in any other business activity with whom you have become affiliated."

## B. Irreparable Harm

### 1. Dealers

Valmont has shown irreparable harm stemming from Rebequi's solicitation of dealers. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). The Eighth Circuit

---

[4] This conclusion may change as the facts develop. For example, if discovery shows Rebequi directed the operations of IARA, personally solicited agribusinesses he had previously worked with, or provided IARA and Bauer with confidential information, Valmont may be able to show a breach of the Severance Agreement.

has recognized that he "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) (citation omitted).  Here, Rebequi was a high-level executive who worked closely with dealers in the Brazilian market.  He was effectively the face of Valmont in Brazil.  And, by approaching dealers who he personally worked with, he is taking the goodwill he earned while working for Valmont and "siphons" it away to his new business ventures.  *Midwest Sign & Screen Printing Supply Co. v. Dalpe*, a case from District of Minnesota, provides a useful contrast.  386 F.Supp.3d 1037, 1056 (D. Minn. 2019). There, the court concluded the employer failed to show a midlevel manager presented a risk to the company's reputation and goodwill when "there is no evidence that" the employee "was the 'face of the company' or that he had a 'personal hold' on customer goodwill." *Id.*  Here unlike there, the evidence showed that Rebequi was a vital and well-connected player in Valmont's Brazil operation.  So, Rebequi—unlike a garden variety employee—has the capacity to material harm Valmont's "intangible assets" in the region. *United Healthcare Ins. Co.*, 316 F.3d at 741.

This risk to reputation and goodwill is not academic.  The harm must be "likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citations omitted).  Here, the record supports that Valmont lost one dealer—Maqcampo -- to Rebequi's recruitment efforts.  And it appears that Rebequi's solicitation was a part of pattern of work on behalf of Bauer—Valmont's competition.  Dealers are vital to Valmont's ability to compete in the Brazilian market.  Moreover, Valmont acted quickly upon learning of Rebequi's attempts to recruit Central.  *See* Filing No. 20-3 at 5.  So,

19

Valmont has adequately shown it is likely to suffer imminent harm to its reputation and goodwill—constituting irreparable harm and supporting the entry of an injunction.

### 2. Employees

The same is not true for Valmont's claims related to solicitation of employees. "[A]n unreasonable delay in moving for the injunction can undermine a showing of irreparable harm and 'is a sufficient ground to deny a preliminary injunction.'" *Ng v. Bd. of Regents of Univ. of Minnesota*, 64 F.4th 992, 997 (8th Cir. 2023) (citation omitted). Here, Valmont has known of Rebequi's efforts to recruit its employees since 2023. And, according to the record, the only employee who left Valmont for Rebequi's ventures left in 2024. But Valmont waited until 2025 to file for an injunction. These circumstances, along with a lack of employee defectors in the recent past, cut against Valmont's assertions of irreparable harm.

### 3. Other claims

For the other claims, for which Valmont did not show a likelihood of success on the merits, Valmont has not shown irreparable harm. Without knowing the nature of the trade secrets, confidential information, or fiduciary duty at play, the Court is left to speculate whether the harm is irreparable or likely. This is insufficient to support a preliminary injunction—especially when Valmont has not shown they are likely to succeed on the merits.

### C. Balance of the Harms

The balance of harms supports issuing an injunction because the limits on Rebequi's business activities are limited in scope and duration. Specifically, Rebequi's noncompete expires in September and no one argues that an injunction would be

20

appropriate past that date.  In other words, come September, even with an injunction, Rebequi is free to compete for Valmont's dealers, customers, and employees.  And, in the meantime, Rebequi is permitted to consult with Baur, attempt to recruit non-Valmont dealers (and even Valmont dealers, if he did not work with them), and continue to work in the irrigation industry.   Moreover, Rebequi's obligations under the injunction are coextensive with his obligations under the Severance Agreement that he freely entered at the end of his employment.  Overall, the balance of harms supports the entrance of a preliminary injunction.

### D.  The Public Interest

The public interest weighs slightly in Valmont's favor.  Specifically, the public interest favor enforcement of voluntary contract obligations.  *See Cigna Corp. v. Bricker*, 103 F.4th 1336, 1348 (8th Cir. 2024) (collecting authority).

### E.  Scope of the Injunction

Taken together the *Dataphase* factors support the entry of a narrow injunction tailored to Valmont's breach of contract claim.  At this time, Valmont is not entitled to injunctive relief related to their trade secrets or confidential information claim.  So, the Court limits the injunction to solicitation of dealers.   The record is silent on which dealers Rebequi worked directly with while at Valmont.  The Court would prefer to give Rebequi specific guidance rather than repeat the terms of the noncompete and encourage follow-on litigation about the injunction, so it is tailoring the injunction to Central and Pivodrip— the two dealers whose contact with Rebequi supported by the record.  The Parties are encouraged to meet and confer and determine whether they can agree to any additional dealers.  Finally, everyone agrees that an injunction should not run past the end date of

21

Rebequi's noncompete agreement.  So, it the Court's preliminary injunction expires when Rebequi's noncompete expires on September 25, 2025.

*        *        *

A preliminary injunction is an extraordinary remedy, and the record does not support such extraordinary relief for most of Valmont's claims.  But Rebequi is—at least for a few more months—bound by the terms of the restrictive covenants in his Severance Agreement.  The Court hopes Rebequi will abide by the terms of his contract.  If not, Valmont is welcome to seek appropriate relief from the Court.

### CONCLUSION

At bottom, this is a business dispute between sophisticated parties.  The Court hopes—with the with the guidance in this order—the parties can reach a business solution and avoid further litigation.  THEREFORE, IT IS ORDERED:

1. Valmont's Motion for a Preliminary Injunction (Filing No. 18) is granted in part and denied in part.

2. Rebequi is enjoined from offering, providing, or soliciting to offer or provide products or services that are the same or substantially similar to or competitive with those provided by Valmont to Central and Pivodrip until September 25, 2025.


Dated this 16th day of June, 2025.

BY THE COURT:

s/ Joseph F. Bataillon_____
Senior United States District Judge
